CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

October 07, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **TAMARA DAWN BAKER,** | ) | |
| Plaintiff | ) | Civil Action No. 1:24cv0007 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

### I. Background and Standard of Review

Plaintiff, Tamara Dawn Baker, ("Baker"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Baker has requested oral argument in this case. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Baker protectively filed an application for SSI[1] on July 11, 2017, alleging disability as of July 11, 2013,[2] based on type 2 diabetes; high blood pressure; neuropathy; and depression. (Record, ("R."), at 227-32, 251.) The claim was denied initially and on reconsideration. (R. at 122-48.) Baker requested a hearing before an administrative law judge, ("ALJ"). (R. at 149.) A hearing was held on November 4, 2019, at which Baker was represented by a nonattorney representative. (R. at 33-83.) By decision dated March 17, 2020, an ALJ found Baker disabled as of June 11, 2019, the day before she reached age 55 years, but not disabled before that date. (R. at 13-25.) Thereafter, this court ordered remand of Baker's claim on the Commissioner's motion for further evaluation of the record. (R. at 865-70.) Consistent with the court's order, the Appeals Council affirmed the ALJ's March 17, 2020, decision, to the extent it found Baker disabled as of June 11, 2019, but it vacated the decision to the extent it found Baker not disabled from July 11, 2017, through June 10, 2019, the day before she turned 55 years of age. (R. at 782.) The Appeals Council also directed the ALJ, on remand, to obtain a psychological consultative examination with a medical source statement regarding the nature, severity and limiting effects of Baker's mental impairments; to reconsider whether Baker has a severe mental impairment; to further consider her residual

---

[1] Baker previously filed an application for disability insurance benefits, ("DIB"), on June 29, 2009. (R. at 85, 100, 248.) By decisions dated December 29, 2009, and August 17, 2010, the State Agency denied her claim. (R. at 85, 100.) There is no indication in the record that Baker pursued this claim further.

[2] Baker later amended her alleged onset date to July 11, 2017. (R. at 14.)

functional capacity; and to obtain vocational expert evidence regarding the effect of the limitations on the occupational base. (R. at 874-76.) A hearing was held before the same ALJ on February 28, 2023, during which a psychological consultative examination was ordered in accordance with the remand order.[3] (R. at 826-35.) Another hearing was held on October 3, 2023, by a different ALJ, after this psychological examination was performed. (R. at 804-25.)

By decision dated November 20, 2023, the ALJ denied Baker's claim. (R. at 782-95.) The ALJ found Baker had not engaged in substantial gainful activity since July 11, 2017, the application date. (R. at 785.) The ALJ determined Baker had severe impairments, namely, diabetes mellitus with neuropathy; obesity; diabetic ulcers; anxiety disorder; and depressive disorder, but he found Baker did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 785-88.) The ALJ found that, from July 11, 2017, through June 10, 2019, Baker had the residual functional capacity to perform light[4] work, except she could lift/carry 30 pounds occasionally and 15 pounds frequently; stand/walk four hours and sit six hours in an eight-hour workday, with two hours sitting at one time, 45 minutes standing at one time and 45 minutes walking at one time; she was limited to occasionally climbing ladders, ropes or scaffolds, stooping, kneeling, crouching and

---

[3] The record reveals that this examination had not been performed. Although the ALJ expressed concerns about DDS's willingness to perform this examination four to six years after the period in question, as well as the relevance of any findings of such an examination to the relevant period, Baker's nonattorney representative wished to reconvene after such an examination was performed.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2023).

crawling; she should avoid concentrated exposure to hazards, such as moving machinery and heights; she required a low-stress job, defined as having only occasional decision making and occasional changes in the work setting; she could not perform production rate or pace work, such as assembly line work, where the work of others would be dependent on her actions; and she could have only occasional interaction with the public and with co-workers. (R. at 788.)  The ALJ found Baker had no past relevant work. (R. at 792.)  Based on Baker's age at the time of her application, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Baker could perform, including the jobs of an office helper, a routing clerk and a marker. (R. at 792-93.) Thus, the ALJ concluded Baker was not under a disability as defined by the Act, from July 11, 2017, through June 10, 2019, and she was not eligible for SSI benefits. (R. at 794.) *See* 20 C.F.R. § 416.920(g) (2023).

After the ALJ issued his decision, Baker pursued her administrative appeals, (R. at 1121-24), but the Appeals Council denied her request for review. (R. at 1-6.) Baker then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2023). This case is before this court on Baker's brief filed May 2, 2024, the Commissioner's brief filed July 2, 2024, and Baker's reply brief filed July 15, 2024.

## II. Facts

Baker was born in 1964, (R. at 811), which, during the time relevant to this decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). She has a high school education and certified nurse aide,

("CNA"), training. (R. at 252, 811.) Baker has no past relevant work. (R. at 252.) Baker testified at the October 3, 2023, hearing that her diabetes during the relevant time was uncontrolled, and she had numbness in her feet, as well as itching in her hands and feet at the time she filed her claim. (R. at 812-13.) She said she retained some feeling in her feet. (R. at 814.) Baker also testified her feet throbbed most of the time, and there was nothing she could do to alleviate the pain, but standing and walking a lot aggravated it. (R. at 814.) She testified she developed foot ulcers, some of which had resulted in both big toes being amputated, and others on her smaller toes and heels that were difficult to heal. (R. at 814.) While Baker could not pinpoint when she began getting these ulcers, she said it had been "a long time [ago.]" (R. at 814-15.) She estimated she could stand for only five minutes. (R. at 819.) Baker said her blood sugar levels during the relevant time averaged 300 to 400, causing her to sweat, feel lightheaded and shaky and to itch in her hands and feet. (R. at 815.) She testified she was prescribed methadone for pain during the relevant time, but she could not recall whether she went to the methadone clinic, which was 40 miles away, daily, weekly or bi-weekly at that time. (R. at 816-17.) However, she stated that every three or four months, she would have to go for a few days before receiving a "take-home" doses. (R. at 816.) Baker testified the methadone clinic also required her to undergo hourly group counseling once or twice weekly and individual counseling at least once a month. (R. at 817.)

Baker testified she also suffered from depression, including difficulty being in public around people, having panic attacks several times weekly and crying spells, sometimes daily. (R. at 817-18.) She said she received some mental health counseling through the methadone clinic, and, although her doctor occasionally gave her medication, it did not help. (R. at 818.) Baker testified she tried to stay away from people, but her daughter would stay with her because she and Baker's

boyfriend did not like for her to be alone due to both her physical and mental health conditions. (R. at 818.)

Tanja Hubacker, a vocational expert, also testified at Baker's hearing. (R. at 819-24.) She testified, among other things, that a hypothetical individual of Baker's age, education and lack of past relevant work experience, who could lift up to 30 pounds occasionally and 15 pounds frequently; who could stand or walk for a total of four hours and sit for six hours in an eight-hour workday, but stand or walk 45 minutes at a time each and sit no more than two hours at a time; who could occasionally climb ladders, ropes or scaffolds, stoop, kneel, crouch and crawl; and who should avoid concentrated exposure to hazards, like moving machinery and heights, could perform the light, unskilled jobs of an office helper, a routing clerk and a marker, all existing in significant numbers in the national economy.[5] (R. at 820-21.) Hubacker also testified that the same hypothetical individual, but who also required a low-stress job, defined as consisting of only occasional decision making and occasional changes in the work setting; who could not perform production rate or pace work, such as assembly line work, where the work of others is dependent on the hypothetical individual's actions; and who was limited to occasional interaction with the public and with co-workers, could perform the same jobs with no erosion in the job numbers. (R. at 821.)

In rendering his decision, the ALJ reviewed records from The Health Wagon; C-Health; Clinch Valley Treatment Center; Russell County Medical Center; Wade Smith, M.S.; Advanced Medical Consultants; Psychiatric Associates of the Virginias; Norton Community Hospital; Tri-County Mental Health and Counseling

---

[5] Hubacker testified that there were 30,000 office helper jobs, 25,000 routing clerk jobs and 15,000 marker jobs available in the national economy. (R. at 820-21.)

Services, Inc.; Family Health Care, Inc.; Alan White, Ph.D.; Tri State Occupational Medicine, Inc.; Mahoning Valley Imaging; Dr. Gerald Klyop, M.D.; Paul Tangeman, Ph.D.; Katina Kelly, Psy.D.; Leslie E. Montgomery, Ph.D., a state agency psychologist; Dr. Gene Godwin, M.D., a state agency physician; Stephen P. Saxby, Ph.D.; and Dr. Jack Hutcheson, M.D., a state agency physician.

When Baker presented to The Health Wagon on March 29, 2017, to establish care, she reported tingling and numbness, as well as anxiety and depression. (R. at 391-92.) A depression screening revealed moderate depression. (R. at 391.) An examination yielded normal findings, including normal motor strength in all extremities, intact sensory exam, and Baker was alert and oriented with intact cognitive function. (R. at 391.) Baker's fasting blood sugar was 93, and her A1c was 7.3. (R. at 391-92.) She was diagnosed with primary hypertension, type 2 diabetes mellitus with diabetic nephropathy and generalized anxiety disorder. (R. at 391.) Baker's blood pressure medication was increased, her diabetes medication and Neurontin were refilled, and she was started on amitriptyline and Effexor for anxiety and depression. (R. at 392.) On April 26, 2017, Baker's fasting blood sugar was 67, and an examination, again, yielded normal findings. (R. at 389.) However, Baker was crying due to leg and back pain, stating she ran out of Neurontin. (R. at 389.) She also continued to report tingling and numbness in her legs. (R. at 390.) She reported attending a methadone clinic, as well. (R. at 390.) On June 7, 2017, Baker stated she could not take the amitriptyline while undergoing methadone treatment. (R. at 387.) Her fasting blood sugar was 263. (R. at 387.) When Baker returned on July 10, 2017, her nonfasting blood sugar was 283. (R. at 385.) Examination findings remained normal, including normal strength in all extremities, intact sensation, including in the feet, and normal pedal pulses. (R. at 385.)

On June 16, 2017, Baker presented to the emergency department at Russell County Medical Center, after her left foot was run over by a vehicle four days previously. (R. at 477, 480.) An examination was normal, except for bruising of the skin. (R. at 478.) In particular, Baker's extremities all appeared grossly normal, with no pain with palpation, she had good dorsalis pedis pulses on both feet, no back pain, normal range of motion of the back and no acute changes on psychiatric examination. (R. at 478.) Baker was diagnosed with an unspecified injury of the left foot and diabetic mellitus with neuropathy, and she was discharged home in good condition with prescription-strength ibuprofen. (R. at 481, 483.)

On August 24, 2017, Baker saw Dr. Brian Easton, M.D., at C-Health for a follow up on diabetes and hypertension. (R. at 402.) Her blood sugar level at that time was 242, her A1c was 9.3, and her triglycerides and cholesterol were elevated. (R. at 422-24.) An examination was normal, including normal cardiovascular and respiratory findings, a normal gait, and Baker was alert and fully oriented, with an appropriate affect and demeanor, as well as good insight and judgment. (R. at 403.) Dr. Easton diagnosed type 2 diabetes and essential hypertension, among other things, and he continued Baker's medication regimen, and instructed her to perform a daily foot inspection and eat a low-cholesterol diet. (R. at 403-04.)

On September 10, 2017, Baker presented to the emergency department at Russell County Medical Center with complaints of epigastric pain, nausea and diarrhea for the previous week, as well as itching of the feet. (R. at 463.) An abdominal and pelvic CT scan revealed cholelithiasis and punctate nephrolithiasis, and a urinalysis showed 4+ bacteriuria with positive nitrates. (R. at 463, 472.) A physical examination revealed epigastric tenderness, but Baker's pedal and radial pulses were adequate on palpation, there was no lower extremity edema and no focal

deficits, and an ECG showed normal sinus rhythm.  (R. at 464, 475-76.)  Baker's blood glucose at that time was 227.  (R. at 467.)  She was diagnosed with gastroenteritis; urinary tract infection; hypertension; dyslipidemia; diabetes mellitus; and polyneuropathy, and she was hospitalized for further evaluation and treatment. (R. at 463-64.)

When she returned to Dr. Easton on September 19, 2017, for a follow up to her hospitalization, she complained of bilateral upper quadrant pain with diarrhea and nausea.  (R. at 546.)  On examination, Baker had mild epigastric and right upper quadrant tenderness, but she, otherwise, exhibited normal findings, including normal cardiovascular and respiratory findings, a normal gait, no skin ulcerations, and she was alert and fully oriented, with an appropriate affect and demeanor and good insight and judgment.  (R. at 547.)

On October 5, 2017, Baker was admitted into the Clinch Valley Comprehensive Treatment Center for methadone treatment by Dr. Joseph Martin, M.D.  (R. at 601.)  Physical and mental status examinations at that time were normal, except for some tachycardia.  (R. at 598-99.)

Baker presented, again, to Russell County Medical Center's emergency department on October 12, 2017, with complaints of intermittent abdominal pain in the right upper quadrant after eating.  (R. at 514.)  On examination, she had hypoactive bowel sounds, decreased pulses in the foot, and she was anxious.  (R. at 516.)  Baker's blood glucose was 231 at that time.  (R. at 516.)  An abdominal ultrasound revealed cholelithiasis and fatty infiltration of the liver.  (R. at 518.) Baker was hospitalized with plans to perform a cholycystectomy the following day. (R. at 520.)  Dr. Michael A. Ulrich, D.O., discussed the importance of quitting

smoking, as Baker presumably had peripheral vascular occlusive disease.  (R. at 516, 520.)  Although Baker had no symptoms of angina, she did endorse shortness of breath when walking uphill.  (R. at 520.)  Dr. Ulrich recommended she begin a walking program after surgery and that she quit smoking by January 1 and begin to wean off methadone over the next three years.  (R. at 520.)  On October 13, 2017, Dr. John M. Kerr, M.D., performed a laparoscopic cholecystectomy with intraoperative cholangiogram.  (R. at 529-30.)  This surgery revealed a fatty liver, and Baker had a normal intraoperative cholangiogram and multiple gallstones.  (R. at 529.)

When Baker returned to Dr. Easton on January 11, 2018, he noted Baker's diabetes was doing well, with no symptoms of high or low blood sugar.  (R. at 542.)  She continued to smoke a pack of cigarettes daily.  (R. at 543.)  Baker's examination was normal, including normal cardiovascular and respiratory findings, a normal gait, no skin ulcerations and normal mental status, including being alert and fully oriented, with an appropriate affect and demeanor and good insight and judgment.  (R. at 543-44.)  Dr. Easton increased Baker's Neurontin and blood pressure medication, and he prescribed amlodipine and omeprazole.  (R. at 544-45.)  Her blood glucose was 140, and her A1c was 9.9 at that time.  (R. at 557-58.)  On March 8, 2018, Baker complained of diarrhea with abdominal cramping for the past several weeks, as well as pleuritic chest pain and chronic cough.  (R. at 614.)  An examination was normal, including normal respiratory and cardiovascular findings; normal gastrointestinal findings; a normal gait; no skin ulcerations; and normal mental status, including being alert and fully oriented, with an appropriate affect and demeanor and good insight and judgment.  (R. at 615.)  Dr. Easton ordered a stool culture, which Baker later canceled after the diarrhea resolved.  (R. at 616, 619.)

Baker saw Dr. Shawne Bryant, M.D., with Advanced Medical Consultants, for a consultative physical examination on March 24, 2018. (R. at 576-81.) She reported smoking a pack of cigarettes daily since she was 17 years old, as well as a history of drug addiction, for which she was on methadone. (R. at 577.) Baker could get on and off the exam table, up and out of the chair and remove her shoes without assistance. (R. at 577.) She was not short of breath and did not present with an assistive ambulatory device. (R. at 577.) Baker was alert and fully oriented, with an appropriate affect and good cognition; she was not nervous; she had good hygiene; she could follow simple directions; she could hear at a normal voice level; and her speech was understandable. (R. at 577-78.) Baker had decreased breath sounds, bilaterally; a grade 2/6 systolic ejection murmur; liver hepatomegaly with minimal tenderness; negative straight leg raise testing, bilaterally; no edema, cyanosis, clubbing, varicosities or tenderness of the extremities; normal extremity pulses; no skin lesions; she could perform finger-to-nose maneuver on the left, but missed one on the right; Romberg's sign[6] was negative; ambulation was normal; she could walk on her heels, toes and in tandem with minimal loss of balance; she could hop on one foot, bilaterally; she could squat to 40 degrees before complaining of back stiffness; muscle strength was full in all muscle groups, bilaterally; deep tendon reflexes were 1+ in the upper extremities, bilaterally, and 2+ in the lower extremities, bilaterally; but she had no sensation in the toes or plantar surfaces of the feet, bilaterally. (R. at 577-78.) Baker had normal range of motion, except for decreased flexion of the cervical spine; external rotation of the shoulders; flexion, internal rotation and external rotation of the hips; plantarflexion of the ankles; and dorsiflexion of the wrists. (R. at 578, 580.)

---

[6] A positive Romberg's sign indicates balance problems related to the body's ability to sense its movements and position. *See* my.clevelandclinic.org/health/diagnostics/22901-romberg-test (last visited Sept. 5, 2024).

Dr. Bryant opined Baker could walk for three to four hours in an eight-hour workday, but for 30 to 45 minutes at a time; stand for three to four hours in an eight-hour workday, but for 30 to 45 minutes at a time; sit for six hours in an eight-hour workday, but for two hours at a time; lift and/or carry 15 pounds frequently and 30 pounds occasionally; perform manipulative maneuvers frequently; and occasionally bend, stoop, crouch and squat. (R. at 579.) She stated these limitations were due to Baker's bilateral foot neuropathy and back pain. (R. at 579.)

On April 4, 2018, Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Baker had no diagnosis of and no treatment for depression and that Baker's activities of daily living were not severely limited by any cognitive impairment. (R. at 91.) On that same day, Dr. Gene Godwin, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding Baker could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push/pull frequently with the lower extremities; frequently perform postural limitations, except for climbing ladders, ropes and scaffolds, which she could never do; and she should avoid concentrated exposure to humidity, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 92-94.) Dr. Godwin based these limitations on Baker's painful neuropathy in the feet, low back pain and loss of sensation in the feet. (R. at 93-94.)

Baker saw Dr. Philip B. Robertson, M.D., with Psychiatric Associates of the Virginias, for a diagnostic psychiatric evaluation on April 11, 2018. (R. at 582-85.) Baker reported she had been in methadone treatment for the prior four years due to

a previous addiction to prescription pain medications. (R. at 582.) She reported having become increasingly depressed, frequently crying and being chronically stressed and struggling with guilt due to not knowing her children were molested when they were young, as well as the recent murder of a boyfriend and good friend. (R. at 582.) She reported poor sleep, poor appetite with weight loss, poor energy, loss of interests, social withdrawal and avoidance and difficulty concentrating. (R. at 582.) Baker denied active suicidal thoughts or a history of suicide attempts. (R. at 582.) She reported smoking two packs of cigarettes daily. (R. at 582.) Baker stated she did a little housekeeping, read a little and watched some television. (R. at 583.)

On mental status examination, Baker was alert, with a composed demeanor; normal psychomotor activity; fluent and spontaneous speech; she had a moderately depressed mood with a stable, but dysphoric, affect, and she was briefly tearful with a constricted range and limited reactivity; sensorium was clear and intact; she had fair concentration; she could spell "world" backwards; thought content was coherent, logical and goal-directed; no psychotic symptoms were elicited; reality testing was intact; she had no suicidal thoughts; judgment and insight were fair; she demonstrated abstracting ability; and her current level of intellectual functioning was average. (R. at 583.) Dr. Robertson diagnosed Baker with persistent depressive disorder; opioid use disorder; and tobacco use disorder. (R. at 583.) He initiated a trial of Effexor and referred her for psychotherapy. (R. at 583-84.) Dr. Robertson strongly encouraged her to stop smoking, and he prescribed a nicotine patch. (R. at 583-84.) Baker's prognosis was deemed uncertain. (R. at 584.)

When Baker saw Dr. Easton on May 1, 2018, she reported her home blood glucose readings had been "excellent." (R. at 607.) An examination was normal,

including normal respiratory and cardiovascular findings; normal gait; no skin ulcerations; and Baker was alert and fully oriented, with an appropriate affect and demeanor and good insight and judgment. (R. at 609.) Dr. Easton referred her to cardiology, and he advised her to eat a low-cholesterol diet, to lose 10 pounds over the next three months, to decrease her A1c below 7.0, to get her fasting blood sugar level between 60 and 135 and to perform daily diabetic foot inspections. (R. at 609.) Baker's lab work showed her blood glucose was 298, and her A1c was 7.9 at that time. (R. at 623, 625.) Dr. Easton adjusted her diabetic medication. (R. at 618.)

In a June 26, 2018, Pain Questionnaire, Baker reported pain in the feet, legs, fingers and lower back that was aching, burning and throbbing in nature. (R. at 270, 274.) She said she had pain "pretty much … all the time," for which she took Neurontin. (R. at 270, 274.) Baker said the Neurontin relieved the pain a little, but nothing resolved it completely. (R. at 274.) She said her pain was mostly in her feet and due to neuropathy. (R. at 270.) Baker said the longer she tried to clean, it would radiate up her leg into the lower back, causing her back to "freeze up." (R. at 270.) She stated she had experienced pain that limited her activities for several years. (R. at 274.)

Baker also completed a Function Report on June 27, 2018. (R. at 278-85.) She reported an ability to do dishes and sweep, with breaks, watch television and prepare convenience-type meals daily. (R. at 278-79.) She denied needing special reminders to care for her personal needs or to take her medication. (R. at 279.) Baker reported performing some weekly house cleaning and laundry, which she did for about an hour at a time, and she helped to care for a cat. (R. at 279-80.) She reported spending time with others, approximately monthly, and she denied difficulty getting along with others. (R. at 281, 283.) She reported that housework

and yard work caused her back to lock up, but she went outside daily.  (R. at 282.)
Baker said she was able to use public transportation, and she did not drive because
her driver's license was suspended.  (R. at 282.)  She reported shopping in stores on
a weekly basis for about an hour, and she could count change and use a checkbook.
(R. at 282.)  Baker reported that her conditions affected her ability to lift, to squat,
to bend, to stand, to reach, to walk and to climb stairs, but she did not indicate that
her ability to sit, to kneel, to remember, to complete tasks, to concentrate, to
understand, to follow instructions, to use her hands or to get along with others were
affected.  (R. at 283.)  She estimated she could walk for 30 to 40 feet before needing
to stop and rest for five minutes; she estimated she could pay attention for just a few
minutes due to difficulty focusing; she did not finish what she started; and she tried
to follow written instructions, but she could not focus, so she did not try new things.
(R. at 283.)  Regarding her ability to follow spoken instructions, Baker stated, "[i]t
depends on what is being ask[ed]."  (R. at 283.)  She reported not getting along with
authority figures, but she had not been fired or laid off from a job due to such
problems.  (R. at 284.)  Baker said she did not handle stress well, and she did not
change her routine unless it was an emergency.  (R. at 284.)

       On August 1, 2018, Stephen P. Saxby, Ph.D., a state agency psychologist,
completed a PRTF in connection with the reconsideration of Baker's SSI claim, in
which he opined she was mildly limited in her ability to understand, remember or
apply information and to adapt or manage herself; and moderately limited in her
ability to interact with others and to concentrate, persist or maintain pace.  (R. at
106-07.)    Saxby  explained  that,  despite  going  through  some  significant
stressors/adjustment issues at that time, Baker remained capable of understanding,
remembering and carrying out simple, repetitive tasks with limited social interaction.
(R. at 107.)  In support of this finding, Saxby noted that, despite Baker's reported

symptoms, her activities of daily living indicated no problems with remembering, concentrating, completing tasks, understanding instructions or getting along with others; she had no problems with personal care; she enjoyed reading; she could go out alone; she used public transportation; she shopped in stores; and she could handle her finances. (R. at 107.)

Saxby also completed a mental residual functional capacity assessment, finding Baker had no understanding and memory limitations or no adaptation limitations. (R. at 111-12.) With regard to sustained concentration and persistence limitations, Saxby opined that Baker was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 111.) Regarding social interaction limitations, Saxby opined that Baker was moderately limited in her ability to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 111-12.) In all other areas, Saxby opined that Baker was not significantly limited. (R. at 111-12.)

On August 2, 2018, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical residual functional capacity assessment in connection with the reconsideration of Baker's SSI claim, in which he opined Baker could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; frequently perform all postural activities, except for climbing ladders, ropes and

scaffolds, which she could do occasionally; and she should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 109-10.) Dr. Hutcheson based these limitations on Baker's diabetes, neuropathy, body mass index, ("BMI"), of 32.4 and her hypertension and hyperlipidemia. (R. at 109-10.) He noted that her examinations were grossly normal, including her gait. (R. at 109.)

Baker continued to treat with Dr. Easton from August 6, 2018, through September 23, 2019. On August 6, 2018, she reported her blood glucose readings had been excellent. (R. at 656.) However, she reported increased stress and panic attacks. (R. at 656.) Baker continued to smoke a pack of cigarettes daily. (R. at 657.) She exhibited normal findings on examination, including normal respiratory and cardiovascular findings; a normal gait; no skin ulcerations; and she was alert and fully oriented, with an appropriate affect and demeanor and good insight and judgment. (R. at 657-58.) Dr. Easton added leg pain and left hip pain to Baker's diagnoses, and he prescribed Celexa for anxiety and meloxicam for pain. (R. at 658-59.) Baker's nonfasting blood glucose reading was 139, and her A1c was 7.8 at that time. (R. at 677, 679.) On November 19, 2018, Baker's heart rate was 120 beats per minute; otherwise, her physical and mental status examinations remained unchanged. (R. at 653-54.) Dr. Easton discontinued meloxicam and initiated prescription-strength ibuprofen for the neuropathy and pain in Baker's feet, and he continued to recommend a low-cholesterol diet and weight loss. (R. at 654.) On March 4, 2019, Baker reported fasting blood glucose readings averaging from the 90s to 140s. (R. at 648.) She reported increased neuropathy, but said she stopped taking Jardiance due to nausea and a urinary tract infection. (R. at 648.) Baker also reported having been diagnosed with shingles, for which she had received steroids and acyclovir, and she reported anxiety, depression, feelings of stress and difficulty concentrating. (R. at 648.) Physical and mental status examinations were

unchanged and normal, except healing shingles were noted on the left trunk.  (R. at 649-50.)  Dr. Easton noted Baker's shingles were improving.  (R. at 651.)

On March 15, 2019, Baker saw Dr. Easton with complaints of low back pain, with associated numbness in both legs that worsened with activity.  (R. at 644.)  She also complained of dysuria, urinary urgency and urinary frequency.  (R. at 644.)  Baker stated her shingles pain had improved, and she requested a letter to allow her to return to methadone treatment.  (R. at 644.)  She stated a desire to quit smoking.  (R. at 644.)  Physical and mental status examinations remained normal, and Dr. Easton noted Baker's shingles lesions were crusted over or resolved.  (R. at 645.)  He added low back pain, dysuria and urinary tract infection to Baker's diagnoses, and he prescribed a nicotine patch and Bactrim.  (R. at 645-47.)  On July 11, 2019, Baker again reported her fasting blood glucose readings averaged from the 90s to 140s, and her heart rate was 115 beats per minute.  (R. at 639-40.)  She reported a blister on a toe on her left foot.  (R. at 639.)  Baker continued to smoke a pack of cigarettes daily.  (R. at 640.)  Physical and mental status examinations remained normal, except for a one-centimeter, round ulcer on the bottom and top of the left first toe, which was nontender, but there was surrounding erythema.  (R. at 640-41.)  Dr. Easton added cellulitis of the foot and lower limb edema to Baker's diagnoses, and he prescribed Farxiga and Augmentin.  (R. at 641.)  Baker's nonfasting blood glucose was 270, and her A1c was 10.0 at that time.  (R. at 706, 708.)  On August 16, 2019, Baker saw Dr. Easton after being hospitalized for three days due to a diabetic ulcer on the left great toe.  (R. at 697.)  She stated she had one Bactrim remaining, but the ulcer was still present.  (R. at 697.)  Baker also complained of back pain and shortness of breath, and her heart rate was 111 beats per minute.  (R. at 697-98.)  Her physical and mental status examinations remained normal, except for a 1.5-centimeter ulcer with surrounding dead skin on the plantar surface of the

first toe, which Dr. Easton debrided.  (R. at 699.)  He prescribed another round of
Bactrim.  (R. at 699.)  By September 3, 2019, Baker had finished the Bactrim and
was feeling better.  (R. at 694.)  Physical and mental status examinations remained
normal, and the ulcer on her left great toe was healing, with viable tissue and
granulation present.  (R. at 695-96.)  On September 23, 2019, Baker complained of
two diabetic ulcers on the bottom of both feet.  (R. at 690.)  In addition to the ulcer
on the left toe, Baker had developed an ulcer on the right toe.  (R. at 690.)  Her heart
rate was 115 beats per minute.  (R. at 691.)  Baker's physical and mental status
examinations remained normal, except for ulcers on the bottoms of both feet, stage
2,[7] with surrounding callus, which were, again, debrided.  (R. at 691-92.)

In an October 25, 2019, email to Baker's former nonattorney representative,
Baker's daughter, Amber Baker, ("Amber"), stated, among other things, that she had
been staying with her mother during the day to help her with chores and meals and
to make sure she did not hurt herself because she could not feel her feet and had a
lot of pain in her back, legs and feet.  (R. at 333.)  She stated that her mother's doctor
wanted her to elevate her legs as much as possible to prevent swelling due to diabetic
ulcers on both big toes.  (R. at 333.)  Amber further stated she was worried about
Baker's mental health because she was severely depressed and had post-traumatic
stress disorder, ("PTSD"), and she believed her mother had other mental health
issues.  (R. at 333.) She said Baker did not sleep, and she cried constantly due to
guilt for things that happened to Amber and Amber's brother.  (R. at 333.)

---

[7] According to the Wagner Diabetic Foot Ulcer Grade Classification System, which
consists of six grades, a grade 2 ulcer indicates a "deep" wound.
my.clevelandclinic.org/health/symptoms/17169-foot-and-toe-ulcers (last visited Sept. 5, 2024).

Baker's former nonattorney representative also sent a letter to Baker's treatment provider at the methadone clinic on November 16, 2019, seeking certain information. (R. at 752-53.) In response to this letter, Tara Null, a resident in counseling, responded, stating she had been Baker's counselor since January 31, 2018. (R. at 752.) She stated that Baker was treated only for opioid use disorder at the clinic, and she made contact at least once monthly for a minimum of 15 minutes. (R. at 752-53.) Null did not answer any questions related to Baker's mental health or associated limitations, instead stating, "Please see PCP documentation." (R. at 752.)

Katina Kelly, Psy.D., completed a psychological evaluation of Baker on March 24, 2023, in accordance with the remand order. (R. at 1131-37.) Her then-current symptoms included sleep difficulty; appetite loss; depressive symptoms, including passive suicidal ideation; anxiety symptoms; weekly panic attacks; short- and long-term memory deficits; and concentration difficulties. (R. at 1133.) Baker reported a history of opioid use from the late 1990s to 2003, with a relapse in 2007, lasting until 2008. (R. at 1133.) Baker reported beginning substance abuse treatment in 2008, in which she remained, attending five days a week to obtain Suboxone. (R. at 1134.) On mental status examination, Baker was fully oriented, cooperative and well-groomed, with adequate social skills, ability to relate and presentation; she had normal posture; normal motor behavior; appropriate eye contact; fluent speech; coherent and goal-directed thought processes, without evidence of hallucinations, delusions or paranoia; her affect was flat; she reported feeling nervous and appeared dysthymic; attention and concentration were intact; recent and remote memory appeared intact; intelligence appeared average; and insight and judgment were good. (R. at 1134-35.)

Baker reported activities of daily living to include dressing, bathing and grooming, cooking and preparing food with the use of a microwave, some cleaning, doing laundry, managing her own money and driving. (R. at 1135.) She said she did not like to shop because she tried to avoid people due to her mental health issues. (R. at 1135.) Baker denied socializing much. (R. at 1135-36.) Her hobbies and interests included coloring, watching television and listening to music. (R. at 1136.) Baker also reported reading and using her phone to text, call and email others, as well as to monitor social media and play games. (R. at 1136.)

Kelly concluded that Baker had no limitations in understanding, remembering or applying either simple or complex directions and instructions or in her ability to be aware of normal hazards and take appropriate precautions; she had mild limitations in her ability to use reason and judgment to make work-related decisions, to sustain an ordinary routine and regular attendance at work and to maintain personal hygiene and appropriate attire; and she had moderate limitations in her ability to interact adequately with supervisors, co-workers and the public, to sustain concentration and perform at a consistent pace and to regulate emotions, control behavior and maintain well-being. (R. at 1136.) Kelly diagnosed Baker with unspecified depressive disorder; unspecified anxiety disorder; and opioid use disorder, on maintenance therapy. (R. at 1136.) She recommended Baker continue her current drug treatment program and begin individual mental health therapy. (R. at 1137.) Baker's prognosis was deemed fair. (R. at 1137.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-22-

Baker argues that the ALJ erred by relying on vocational expert Hubacker's testimony without properly addressing post-hearing rebuttal evidence. (Plaintiff's Social Security Brief, ("Plaintiff's Brief"), at 4-13.) Baker also argues that the ALJ erred by failing to account for the "total limiting effects" of her severe impairments. (Plaintiff's Brief at 14-22.)

As stated herein, at step five of the sequential disability evaluation, the burden shifts to the Commissioner to demonstrate that there is other work, existing in significant numbers in the national economy, that a claimant can perform, given her residual functional capacity. *See* 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2) and 416.966 (2023); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). One way an ALJ can meet this burden is through vocational expert testimony. *See* SOCIAL SECURITY RULING, ("S.S.R."), 00-4p, 2000 WL 898704 (Dec. 4, 2000). Here, the ALJ relied on testimony from vocational expert Hubacker in finding Baker could perform the jobs of an office helper, a routing clerk and a marker, all existing in significant numbers in the national economy. (R. at 793-94.) Hubacker stated her testimony was consistent with the Dictionary of Occupational Titles, ("D.O.T."), but that the D.O.T. did not address a claimant's ability to stand, to walk or to sit at one time. (R. at 822.) Likewise, she said the DOT did not address "climbing, pace or social interaction in the same manner defined in the hypothetical, or the time away from the work station or absenteeism." (R. at 822.) Hubacker stated her testimony regarding the job numbers, which was based on the assessed residual functional capacity, including social interaction and production rate restrictions, was based on her "experience assisting individuals with disabilities in return to work, in combination with the DOT where appropriate." (R. at 822.)

Following the October 2023 ALJ hearing, Baker's former nonattorney representative filed objections to Hubacker's testimony, (R. at 1121-24), as well as rebuttal evidence in the form of a report from Karen R. Starr, an Accredited Disability Representative, who considered the limitations contained in the ALJ's residual functional capacity. (R. at 1125-27.) Starr opined that the jobs relied upon to deny benefits at step five could not be performed by an individual with those limitations. (R. at 1125-27.) First, Starr opined that the number of jobs available, as found by Hubacker, was overstated. (R. at 1125.) This opinion was based on her experience, as well as information about how jobs are performed that is collected by the United States Department of Labor / Bureau of Labor Statistics, ("DOL"), in particular, the Occupational Requirements Survey, ("ORS"),[8] the O*NET[9] and the D.O.T. (R. at 1125.) Starr said that her information regarding job numbers was based upon the most recent version of Job Browser Pro SkillTRAN, ("JBP")[10]. (R. at 1125.) Additionally, Starr opined that an individual performing the office helper job would be in "perpetual motion" throughout the office performing messaging

---

[8] "The ORS provides job-related information regarding physical demands; environmental conditions; education, training, and experience; as well as cognitive and mental requirements for jobs in the U.S. economy." bls.gov/ors (last visited Sept. 10, 2024).

[9] "The O*NET system is maintained by a regularly updated database of occupational characteristics and worker requirements information across the U.S. economy. It describes occupations in terms of the knowledge, skills, and abilities required as well as how the work is performed in terms of tasks, work activities, and other descriptors." dol.gov/agencies/eta/onet (last visited Sept. 10, 2024).

[10] JBP or SkillTRAN is a statistical database that provides a searchable copy of the DOT, allowing users to search for jobs by job title, DOT code or keyword(s) in the title and task description. *See Kimberly M. v. Kijakazi*, 2023 WL 4982794, at *6 (E.D. Va. July 11, 2023). Courts and vocational experts recognize JBP as a reliable source for estimating the number of national job positions available. *See Kimberly M.*, 2023 WL 4982794, at *6 (citing *Purdy v. Berryhill*, 887 F.3d 7, 14 (1st Cir. 2018); *Collins v. Berryhill*, 2018 WL 4232888, at *10 (E.D. Va. Aug. 20, 2018)). JBP estimates employment numbers by cross-referencing data from multiple administratively recognized sources such as the D.O.T., the Occupational Outlook Handbook, Occupational Employment Statistics and census reports. *See Kimberly M.*, 2023 WL 4982794, at *6.

duties, and it would be unknown from one day to the next how much standing and walking would be required in this job. (R. at 1256.) Thus, on some days, it would be consistent with the ALJ's limitation to four hours of standing/walking, but on other days, it could require a full eight hours of standing/walking. (R. at 1126.) Starr further stated, according to her experience, that the office helper job had significant customer service aspects and was consistent with the DOL's description of the job as being semi-skilled, rather than unskilled, due to the use of technology and customer service skills. (R. at 1126.)

Regarding the routing clerk job, Starr opined, based on her experience and current DOL data, that it required significantly more than the six hours of standing/walking per day allowed by light work. (R. at 1126.) Instead, she stated that workers in these jobs stand approximately 7.3 hours of the day, which was consistent with her experience. (R. at 1126.) Starr further stated that the job of routing clerk was rated by the DOL as semi-skilled, as opposed to unskilled, and 90 percent of such workers have daily face-to-face discussions with others. (R. at 1126.) Thus, Starr opined that there would be far less than 1,000 of these positions available, if not zero. (R. at 1126.)

Lastly, regarding the marking clerk job, Starr stated that, based on her experience and current DOL data, it also required significantly more than six hours of standing/walking daily. (R. at 1126.) She also opined that 85 percent of such workers were under time pressure to perform their job at least once per week, which was inconsistent with the ALJ's limitation to occasional workplace changes. (R. at 788, 1127.) Additionally, Starr noted that this job is semi-skilled, not unskilled, and most of these workers have very frequent contact with others. (R. at 1127.) In fact, she stated that 90 percent of these workers have such contact every day, and she

-25-

further stated that these workers must be able to work in and lead teams of workers. (R. at 1127.)  Starr concluded, based on the current data, which was consistent with her experience, that there were, at best, only a trace number of any of the three jobs relied upon by the ALJ.  (R. at 1127.)

In his decision, the ALJ noted Starr's findings, which Starr appeared to be arguing created an apparent conflict with the D.O.T.  (R. at 793-94.)  However, the ALJ found Hubacker's testimony more convincing. (R. at 794.)  Baker argues that the ALJ's decision to discredit the Starr Report because it is inconsistent with the D.O.T. "misses the point of the evidence and arguments submitted post-hearing that the [DOL's] *updated* resource demonstrates that the jobs at issue are no longer performed as they once were, i.e., are no longer *up-to-date and reliable* as the regulations plainly require… [20 C.F.R.] §§ 416.966(d) and 416.960; S.S.R. 00-4p; *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989) (vocational testimony must be based on up-to-date and reliable vocational information)." (Plaintiff's Brief at 10.)

First, the court notes that, when objecting to a vocational expert's testimony, a plaintiff must raise the argument during the hearing or risk waiving it.  *See Revere v. Berryhill*, 2019 WL 99303, at *3 (E.D. Va. Jan. 3, 2019) (citing *Sayre v. Chater*, 113 F.3d 1232 (Table), 1997 WL 232305, at *2 (4th Cir. May 8, 1997) (finding plaintiff's "broadside attack on the [VE's] testimony" waived where plaintiff failed to raise the issue with either the ALJ or the Appeals Council)).  Here, Baker's former nonattorney representative did not raise these arguments at the hearing, nor did she submit them to the Appeals Council.  Moreover, the Fourth Circuit has not specifically addressed whether an ALJ must rule on all post-hearing objections, but district courts within this circuit have held that ALJs need not address them.  In *Looney v. Berryhill*, the court held that "[t]he ALJ had no duty to address those

opinions that plaintiff made only in his post-hearing brief." 2018 WL 3826778, at
*13 (E.D. Va. Aug. 10, 2018); *see also Jenkins v. Colvin*, 2016 WL 4373701, at *8
(W.D. N.C. Aug. 12, 2016) (finding that the plaintiff waived his post-hearing
objection to vocational expert testimony because plaintiff had the opportunity to
challenge the testimony during the hearing and failed to do so).

Here, despite not raising any objections to Hubacker's testimony at the
hearing, the ALJ, nonetheless, dedicated approximately one entire page of the
decision to addressing the post-hearing objections. (R. at 793-94.) Specifically, as
stated above, the ALJ compared Hubacker's and Starr's findings, concluding that
Hubacker's were consistent with the D.O.T., while Starr's were not. (R. at 794.)
For this reason, the ALJ found Hubacker's, not Starr's, findings convincing. (R. at
794.) For the reasons that follow, I find that the ALJ committed no error in doing
so.

Just like the plaintiff in *Looney*, Baker argues that use of the D.O.T. is
outdated. *See* 2018 WL 3826778, at *13. However, the court in *Looney* held that
objections to the D.O.T. "lack merit, because the DOT remains a valid source of job
data used by the SSA." 2018 WL 3826778, at *13. In fact, courts have consistently
held that the ALJ is not obligated to resolve conflicts between the vocational expert's
testimony and non-D.O.T. sources. *See Kimberly M.*, 2023 WL 4982794, at *6
(citing *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1365 (11th Cir. 2018))
(holding that an apparent conflict is one that is "reasonably ascertainable or evident
from a review of the DOT and the [vocational expert's] testimony"); *Spurlock v.
Berryhill*, 2018 WL 791302, at *20-21 (M.D.N.C. Feb. 8, 2018) (finding that ALJs
are required to resolve apparent conflicts "only between the VE's testimony and the
DOT."); *Wendei L.P. v. Comm'r of Soc. Sec.*, 2020 WL 606591, at *1 (W.D. Wash.

Feb. 6, 2020) (finding no conflict between the vocational expert's testimony and the D.O.T. because plaintiff's objections were based on SkillTRAN and added limitations that did not appear in the D.O.T.)  The court in *Kimberly M.* stated that, because SkillTRAN was a non-D.O.T. source, courts generally had held ALJs were not required to resolve a conflict between it and a vocational expert's testimony.  *See* 2023 WL 4982794, at *6.  The *Kimberly M.* court similarly held that ALJ's have no duty to resolve conflicts with other non-D.O.T. sources, including, but not limited to, O*NET.  *See* 2023 WL 4982794, at *6 n.5.  Under Agency regulations, the D.O.T. remains the primary source of reliable job information and work requirements for the Agency at steps four and five.  *See* S.S.R. 00-4p, 2000 WL 1898704, at *4.  All of this being the case, the ALJ has no duty to resolve conflicts between the O*NET and the D.O.T.  *See Tracey K. v. Kijakazi*, 2023 WL 2397491, at *4 (E.D. Va. Jan. 26, 2023). Thus, there can be no apparent conflict warranting remand based on that alone. Neither the regulations nor the courts within the Fourth Circuit require the ALJ to identify or discuss conflicts between O*NET and the D.O.T.  *See Tracey K.*, 2023 WL 2397491, at *7 (citing S.S.R. 00-4p, 2000 WL 1989704, at *2-3 (in making disability determinations, the D.O.T is the primary source, as well as its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles)).

For these reasons, I find that the ALJ had no obligation to resolve any conflict between Hubacker's testimony and any of the opinions in the Starr Report that were based on non-D.O.T. sources.  Instead, the ALJ is required to resolve conflicts between only vocational expert testimony and the D.O.T.  Here, the ALJ adequately addressed Baker's post-hearing objections because he explained that Hubacker's testimony was consistent with the D.O.T., while Starr's findings were inconsistent with the D.O.T.

Baker next argues that the ALJ erred in his residual functional capacity finding by failing to account for the total limiting effects of her severe impairments. For the following reasons, I find that the ALJ's residual functional capacity finding is supported by substantial evidence.

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2023). The ALJ found Baker had the residual functional capacity to perform a limited range of light work, as stated more specifically herein. (R. at 788.) Baker first argues that the ALJ improperly elevated objective findings over her subjective complaints. The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 416.929 and S.S.R., 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[11] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[12] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether she is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 594-95. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs

---

[11] "Symptoms" are defined in the regulations as a claimant's own description of her medical impairment. *See* 20 C.F.R. § 416.902(n) (2023).

[12] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 416.929(c)(2) (2023).

must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 416.929(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker*, 889 F.2d at 49; *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her medical] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 416.929(c)(4) (2023). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4).

Here, after stating his residual functional capacity finding, the ALJ stated as follows in his decision:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. …
>
> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment(s) … that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying … impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 788.) The ALJ next turned to an analysis of Baker's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 790.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Baker's allegations about her symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Baker's pain under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 790.) To support this finding, the ALJ summarized Baker's testimony, including recounting her alleged symptoms, as well as her statement that she visited a methadone clinic either daily or every two weeks. (R. at 789.) The ALJ also noted the October 2019 email from Baker's daughter, stating she had been staying with Baker during the day to help with daily activities and to ensure that Baker did not hurt herself since she could not feel her feet and had a lot of back, leg and foot pain. (R. at 789.) The ALJ then recounted the relevant medical evidence in the record, which will not be repeated here. (R. at 789-90.) In analyzing the evidence, the ALJ correctly noted that, although Baker had no sensation in parts of her feet, findings on examination were, otherwise, unremarkable. (R. at 791.) Moreover, although the medical records show that Baker had diabetes with complaints of neuropathy, they do not show abnormalities resulting from this neuropathy. (R. at 791.) For instance, the ALJ noted Baker had normal foot sensation in July 2017, and a normal gait was regularly observed. (R. at 791.) The ALJ also stated that Baker did not indicate substantial pain issues when taking Neurontin. (R. at 791.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). He noted that Baker's BMIs were in the low 30s, which would not contribute much to difficulty with ambulation. (R. at 791.) The ALJ further correctly noted that, while the medical records showed ulcerations after the period at issue, they did not show them during the relevant period. (R. at 791.) In particular, the record shows that the first mention of any such foot ulcerations was on July 11, 2019, when Baker had an ulcer on a toe on her left foot. (R. at 641.) This is outside the time relevant to this court's decision and during the time that Baker already has been

-32-

found to be disabled.  The ALJ also found that the consultative examiner's exertional and postural limitations accommodated Baker's diabetic neuropathy, obesity and tendency to ulcers, and he stated he was imposing a limitation regarding hazards as a precaution, despite the record not indicating issues with lightheadedness or shaking due to diabetes, and despite Baker reporting in July 2018 that she did not have signs of blood glucose level abnormalities. (R. at 791.)  The ALJ also correctly stated that the record did not demonstrate any manipulation difficulties. (R. at 791.)

I also am not persuaded by Baker's argument that she is disabled because she would be absent more than two days monthly and because she would be off task from 12 to 20 percent of the time due to pain and her treatment therefor, including visits to a methadone clinic.  The ALJ found that the record did not support a finding that Baker had regular, intense pain. (R. at 791.)  Instead, as stated above, he found the record indicated that when Baker was on Neurontin, she did not have substantial pain. (R. at 791.)  Moreover, the ALJ found Baker did not attend the methadone clinic due to pain, but for her history of addiction, a finding that is supported by her treatment provider's responses to a November 2019 inquiry sent by Baker's former nonattorney representative. (R. at 752-53, 791.)  Additionally, I find that a statement by this same provider that Baker made contact at the clinic at least once a month for a minimum of 15 minutes, coupled with Baker's testimony that she could not recall how often she went to the clinic during the relevant time, does not support a finding of significant off-task time or absenteeism for this treatment. (R. at 791.)  While Baker testified she attended both group and individual counseling at the clinic, she provided no such treatment records.

For all the above-stated reasons, I find that the ALJ did not improperly disregard Baker's statements about her pain. To the contrary, the ALJ thoroughly

considered such statements and credited them to the extent they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about the intensity, persistence and limiting effects of her symptoms, statements and other information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at *4. Here, the ALJ reviewed Baker's relevant medical history and her subjective allegations before finding her statements regarding the severity of her limitations were not entirely credible because they were not fully supported by the objective medical evidence and her treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Baker's subjective statements, and he provided a sufficient rationale for doing so. It is well-supported that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Here, the ALJ's decision was thorough and applied the proper legal standard, and this court will not reweigh the evidence.

Lastly, to the extent that Baker argues that she is disabled because her mental health symptoms, particularly frequent panic attacks and crying spells, would cause her to be absent from work more than two days monthly and cause her to be off task from 12 to 20 percent of the time, I am not persuaded.  The ALJ acknowledged Baker's testimony that she had panic attacks and crying spells several times weekly, as well as her daughter's October 2019 email stating Baker cried constantly and could not focus on anything.  (R. at 789.)  However, in his decision, the ALJ found Baker was only mildly limited in her ability to understand, remember or apply

information and moderately limited in her ability to concentrate, persist or maintain pace. (R. at 787.) He noted, among other things, that in the April 2018 psychiatric evaluation, Baker did not have memory difficulty, and while she reported being socially withdrawn and avoidant, this did not indicate an issue with panic attacks. (R. at 787.) He also noted that Baker was briefly tearful during this same evaluation, but she had fair concentration. (R. at 787.) Moreover, the ALJ stated that Baker did not demonstrate concentration difficulties during the 2023 consultative psychological evaluation.[13] (R. at 787.) Otherwise, the ALJ correctly stated that Baker generally had no psychological abnormalities. (R. at 787.) He concluded that the limitation to low-stress work would prevent mood exacerbations, thereby allowing Baker to maintain concentration. (R. at 787.) The ALJ also noted that, while Baker reported panic attacks in April 2018, she did not normally express such complaints, and the limitation to low-stress work would prevent her from becoming overwhelmed. (R. at 787.) The ALJ stated that Baker's examinations during the relevant time consistently yielded findings of an appropriate affect and demeanor. (R. at 789-90.) Even during the April 2018 psychiatric evaluation, when Baker reported increased depression, frequent crying and difficulty concentrating, she was composed, only briefly tearful and had fair concentration with coherent thoughts. (R. at 790.) Likewise, when she reported in August 2018 experiencing more stress and panic attacks, she continued to have an appropriate affect and demeanor at that time and in November 2018. (R. at 790.)

For all the foregoing reasons, I find that the ALJ's evaluation of Baker's pain, as well as her mental symptoms, was based on a correct legal standard and is supported by substantial evidence. Based on the same evidence stated above, I

---

[13] The court notes that this evaluation occurred four to six years after the relevant period and assessed Baker's then-current condition.

further find that substantial evidence supports the ALJ's residual functional capacity finding and ultimate finding that Baker was not disabled under the Act and not entitled to benefits. I further deny Baker's request to present oral argument based on my finding that it is not necessary, in that the parties have more than adequately addressed the relevant issues in their written arguments.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The ALJ properly considered the post-hearing rebuttal evidence to vocational expert Hubacker's testimony;
2. Substantial evidence exists in the record to support the ALJ's consideration of Baker's subjective complaints;
3. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and
4. Substantial evidence exists in the record to support the Commissioner's finding that Baker was not disabled under the Act from July 11, 2017, to June 10, 2019, and is not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   October 7, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-37-